IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| MARCO R. M., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Action No. 2:21-cv-38 |
| ) | |
| KILOLO KIJAKAZI,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff Marco R. M.'s ("Plaintiff") Complaint, ECF No. 1, filed pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Plaintiff filed a Motion for Summary Judgment and Brief in Support, ECF Nos. 12, 13, and the Commissioner filed a cross-Motion for Summary Judgment and Memorandum in Support, ECF Nos. 14, 15. Plaintiff filed a Reply, ECF No. 16. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned makes

---

[1] On July 9, 2021, Kilolo Kijakazi was appointed as the Acting Commissioner of Social Security. The Court thus substitutes Acting Commissioner Kilolo Kijakazi for former Commissioner Andrew Saul in this matter pursuant to Federal Rule of Civil Procedure 25(d).

this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 14, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

On January 24, 2018, Plaintiff protectively filed applications for DIB and SSI, alleging an onset date of July 5, 2009. R. at 228, 235.[2] Plaintiff previously received disability benefits from July 5, 2009, to October 31, 2014, upon which date his benefits ended following a continuing disability review. R. at 12. While Plaintiff did not expressly request reopening and revision of the prior determination, the administrative law judge implied such a request here because Plaintiff alleged a disability onset date within the previously adjudicated period. R. at 12. Plaintiff's new applications were initially denied on February 9, 2018, and again denied upon reconsideration on May 14, 2019. R. at 142–43, 178–83. On June 28, 2019, Plaintiff requested a hearing in front of an administrative law judge. R. at 190–91. A hearing was held (via telephone) on May 7, 2020, before Administrative Law Judge O. Price Dodson ("the ALJ"). R. at 34–56. Plaintiff testified at the hearing with representation, as well as an impartial vocational expert. R. at 36–56. On June 23, 2020, the ALJ issued a decision finding Plaintiff not disabled. R. at. 12–26. Plaintiff then filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on November 17, 2020, making the ALJ's decision the Commissioner's final decision. R. at 1–6.

Having exhausted his administrative remedies, on January 19, 2021, Plaintiff filed a Complaint for judicial review of the Commissioner's decision. ECF No. 1. The Commissioner

---

[2] "R." refers to the certified administrative record that was filed under seal on April 2, 2021, ECF No. 9, pursuant to Local Civil Rules 5(B) and 7(C)(1).

filed an Answer on April 2, 2021. ECF No. 8. The matter was referred to the undersigned U.S. Magistrate Judge ("the undersigned") on April 7, 2021. ECF No. 10. Following the afore-described summary judgment briefing, the matter was referred to the undersigned and is now ripe for recommended disposition.

## II. RELEVANT FACTUAL BACKGROUND

Plaintiff was twenty-nine years old at the time of his alleged disability onset date of July 5, 2009. R. at 24. At the date of the ALJ's decision, Plaintiff was forty years old. *See* R. at 26, 39, 58. Plaintiff appeared with counsel at the ALJ administrative hearing on May 7, 2020. R. at 36. Both Plaintiff and an impartial vocational expert ("VE") testified at the hearing. R. at 36, 52. The Record included the following factual background for the ALJ to review.

Plaintiff stated during the hearing that he lived with his girlfriend and her cousin and nephew. R. at 40. Plaintiff completed the eleventh grade and never received a GED nor ever had a driver's license. R. at 40. He worked several short-term jobs, and worked as a fry cook for seven years at McDonald's, which was his last known employment. R. at 41–42. Plaintiff's brief alleges that Plaintiff is now homeless and "living at the Econo Lodge." ECF No. 13 at 4.

### A. Plaintiff's Medical Records Relevant To Alleged Impairments

Plaintiff sustained a gunshot wound in 2009 which resulted in an above knee amputation of his right leg. R. at 471. He was initially fitted for a prosthesis and attended therapy. R. at 488. In a May 2015 examination Plaintiff advised that he had phantom limb pain and several less severe complaints. R. at 471–72. The doctor increased his medication. R. at 472. In January 2016, Plaintiff consulted another doctor to discuss his phantom limb pain and explained that his prosthesis had stopped fitting well, so he had to hold it with one hand while he moved, and because he got ulcers on the stump, he sometimes used crutches. R. at 488. While Plaintiff had been

3

advised to get a new prosthesis, he had neither the insurance coverage nor money for one. R. at 488. In January 2019, Plaintiff had obtained Medicaid and was fitted for a new prosthesis. R. at 920–22. At the ALJ hearing, Plaintiff expressed severe pain from his amputated leg, reported that he has had bad falls recently, and testified that he could not perform most household chores, or any cooking. R. at 43–44, 48–50. Plaintiff reported that he had attended some AA meetings but largely stayed at home to read, draw, or play video games. R. at 43–44. Plaintiff also reported a history of suicidal thoughts, suicide attempts, and regular crying spells. R. at 46–48.

In 2010, Plaintiff was evaluated by a clinical psychologist, who diagnosed him with post-traumatic stress disorder and borderline intellectual functioning. R. at 407. The psychologist observed that Plaintiff's mood and affect were "depressed," and recounted that Plaintiff experienced nightmares which trigger autonomic arousal disorder and suffered from intrusive thoughts. R. at 406.

In a March 2019 evaluation, Randy Rhoad, Psy. D., reported that Plaintiff seemingly presented with "cognitive sluggishness" and "difficulty with focus and concentration." R. at 762. He noted that Plaintiff was "generally unkempt" and diagnosed him with major depressive disorder, alcohol use disorder, cannabis use disorder, and somatic symptom disorder. R. at 761–63.

A medical source statement by Dr. Patricia Y. King dated March 2020 provided mental health diagnoses of post-traumatic stress disorder, major depressive disorder, unspecified anxiety disorder, and alcohol use disorder. R. at 948.

### B. Testimony By The Vocational Expert

Vocational Expert George J. Starosta ("the VE") testified at the ALJ hearing. R. at 52–55. In assessing Plaintiff's past work, the VE testified that his previous work as a fry cook was

4

"medium, unskilled work." R. at 52–53. The ALJ then posed hypotheticals to the VE, asking him to assume that he was "dealing with a younger individual, with an eleventh[-]grade education, and past work experience as described in the record." R. at 53. In the first hypothetical, the ALJ asked the VE to:

> [A]ssume that the individual is limited to sedentary exertion . . . [and] he would need to avoid the operation of foot controls; standing and walking would be limited to no more than ten minutes at a time; he should avoid crawling, kneeling, or crouching, or climbing; he will be limited to performing routine repetitive tasks; he would need to avoid occupations requiring direct interaction with the general public; should only have occasional contact with supervisors or co-workers; and should avoid fast-paced production.

R. at 53. The ALJ asked the VE if such an individual would qualify for any available jobs. R. at 53. The VE responded "yes," and opined that "jobs that would fit this set of limitations . . . include jobs like a mail sort clerk, also known as an addresser," as well as "surveillance system monitor . . . limit[ed] to video monitoring only," and "table worker, [] also known as a fabricator." R. at 53-54. In limiting the job of surveillance system monitor, the VE clarified that while video monitoring was previously done largely "in transportation centers, . . . it has expanded throughout the economy." R. at 53–54.

In the second hypothetical, the ALJ asked the VE to "assume the same limitations within the first hypothetical, with an additional restriction. That the individual will require extra supervision on a frequent basis." R. at 53. The ALJ clarified that the supervision required would be a "moderate degree of extra assistance and supervision at times . . . [so it would be considered] occasionally" and the person "would be off-task greater than ten percent of the time." R. at 53. After the ALJ asked how the new restriction would affect job availability, the VE testified that the restriction would "preclude all competitive work." R. at 54. The VE testified that there was no

5

"significant difference between the way [he] used these jobs and the way they're defined in the Dictionary of Occupational Titles." R. at 54.

### III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920 (2020); *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Acting Commissioner. *Mastro*, 270 F.3d at 177. It is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Acting Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if:

> (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.

*Strong v. Astrue*, No. 8:10-cv-357, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity)). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520 (2020)). Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity throughout the relevant period from November 1, 2014, through the date of the decision. R. at 15. At step two, the ALJ found the following severe impairments: right above the knee amputation, post-traumatic stress disorder, and borderline intellect. R. at 15. The ALJ concluded that these impairments were "severe" because they "are medically determinable impairments that, when considered either individually or in combination, significantly limit the claimant's mental and physical abilities to perform one or more basic work activities." R. at 15 (referencing SSR 85-28, 1985 WL 56856 (Jan. 1, 1985)).

At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. at 15–17 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.[3] The ALJ determined that Plaintiff's medically determinable mental impairments caused no more than moderate limitations in all functional areas listed in "paragraph B." R. at 17. Similarly, the ALJ opined that Plaintiff's mental impairments did not satisfy the "paragraph C" criteria.

After step three, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a) and 416.967(a), with the following limitations: he can never operate foot controls; he is limited to standing or walking for no more than ten minutes at a time; he can never crawl, kneel, crouch, or climb; he is limited to performing routine, repetitive tasks; he is to have no direct interaction with the general public; he is to have only occasional contact with supervisors or coworkers; and he must avoid fast-paced production. R. at 17–18.

---

[3] The ALJ compared Plaintiff's mental impairments with the criteria of listings 1.05, 12.11, and 12.15. R. at 16.

7

In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p." R. at 18. The ALJ stated that Plaintiff's determinable impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not consistent with medical evidence and other evidence." R. at 18–19. The ALJ found that the medical record supported findings of right above the knee amputation, post-traumatic stress disorder, and borderline intellect. R. at 19. The ALJ reviewed Plaintiff's medical records and noted treatments for various complaints, including phantom limb pain, chest pain, suicide attempt, substance abuse, and mental health concerns. R. at 19–21. Medical records indicated that Plaintiff had moderate difficulty with many activities, and his examinations revealed, respectively, an unremarkable x-ray, a minimally displaced rib fracture and a non-displaced rib fracture, superficial abrasions, inconsistently positive alcohol tests, and treatment by therapy. R. at 19–21.

The ALJ also considered the medical opinions and prior administrative medical findings in accordance with 20 C.F.R. § 404.1520c. R. at 21. The ALJ considered evaluations from state agency psychological examiners Dr. Leslie Montgomery and Dr. Eric Oritt; state agency medical evaluators Dr. Richard Surrusco and Dr. Joseph Familant; consultative medical examiner Dr. Richard Hoffman; consultative psychological examiner Dr. Randy Rhoad; treating practitioner and Licensed Clinical Social Worker Mr. Anthony Foy; and Dr. Patricia Y. King. R. at 22–23.

At steps four and five, the ALJ determined that Plaintiff was incapable of performing his past relevant work as a fry cook, which is considered medium, unskilled work. R. at 24. The ALJ noted that transferability of job skills is not material to the determination of disability because the

Medical-Vocational Rules support the finding that the claimant is not disabled regardless of any transferable job skills. R. at 25. The ALJ relied on the VE's testimony that "claimant's past work is eliminated by the restrictions in the residual functioning capacity." R. at 24. While the ALJ determined that Plaintiff cannot resume his prior employment, Plaintiff could perform other that exist in significant numbers in the national economy. The ALJ relied on the VE's testimony that Plaintiff could perform the requirements of the following representative occupations: (1) addresser, with approximately 19,000 positions nationally; (2) surveillance system monitor, with approximately 161,000 positions nationally; and (3) table worker, with approximately 3,000 positions nationally. R. at 25. Thus, the ALJ determined that Plaintiff was not disabled from the alleged onset date, November 1, 2014, through the date of his decision, June 23, 2020. R. at 26.

## IV. <u>STANDARD OF REVIEW</u>

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Britt v. Saul*, No. 19-2177, 2021 WL 2181704, at *2 (4th Cir. May 28, 2021) (quoting *Craig*, 76 F.3d at 589). The Court looks for an "accurate and logical bridge" between the evidence and the ALJ's conclusions. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

9

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff's appeal to this Court raises multiple challenges to the ALJ's decision. First, Plaintiff argues that the ALJ failed to resolve a conflict with both the surveillance system monitor position and the addresser position, and that the addresser position is obsolete in the national economy. The result of such errors means that only the table worker position remains as a possible job available in the national economy. However, Plaintiff contends that because the 3,000 available table worker jobs in the national economy is not a "significant" number, the ALJ could not rely on that position and erred in doing so.

### A. The ALJ Did Not Fail to Resolve a Conflict With Respect to Either the Surveillance System Monitor Position or the Addresser Position.

Plaintiff argues that the ALJ failed to resolve conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT") with respect to both the surveillance system monitor position and the addresser position. At step five of the sequential analysis, the burden shifts to the Commissioner, and the ALJ must determine whether the claimant can perform work that exists in the national economy considering the claimant's RFC, age, education, and work experience. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015). To

10

meet this burden, the ALJ may rely on the DOT, and may elicit testimony from a VE to "address complex aspects of the employment determination, including the expert's observations of what a particular job requires in practice or the availability of given positions in the national economy." *Id.* If the VE's testimony conflicts with the DOT, ALJ's must "inquire, on the record, . . . whether the vocational expert's testimony conflicts with the [DOT], and also requires the ALJ elicit a reasonable explanation for and resolve conflicts between the expert's testimony and the DOT." *Id.* at 207–08 (citing SSR 00-4P, 2000 WL 1898704 (Dec. 4, 2000)) (internal quotations omitted). The ALJ has an affirmative and independent duty to identify and resolve apparent conflicts between the VE's testimony and the DOT. *Id.* (noting that the VE's affirmative response when asked if her testimony conflicts with the DOT is not enough to fulfill the ALJ's duty). If the ALJ resolves the conflict by determining the VE's explanation is reasonable, and further explains why the VE's explanation is reasonable, then the ALJ can rely on the VE's testimony to support an ALJ's disability determination. *Id.*

### 1. *The Surveillance System Monitor Position*

Plaintiff argues that the ALJ failed to resolve a conflict regarding the surveillance system monitor position because the ALJ limited Plaintiff to "no interaction with the public" but the Selected Characteristics of Occupations ("SCO")[4] states that the surveillance system monitor position requires frequent "talking"—i.e., communication with clients or the public for 67% of an eight-hour workday. Plaintiff contends that the VE improperly resolved the conflict by explaining that the surveillance system monitor position used to be performed in public transportation centers, which placed the person into "a lot of public contact," but the job is no longer performed in that

---

[4] The SCO is a companion to the DOT that lists the specific functional requirements for specific DOT occupations. *See* SSR 00-4p, 2000 WL 1898704, at *1 (referring to "information in the [DOT] including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO).").

11

setting, which eliminates any contact with the public. ECF No. 13 at 9. According to Plaintiff, the VE's explanation did not resolve the conflict because under the Commissioner's regulations, "contact," as used by the VE, is different than "interaction," and the RFC did not limit Plaintiff to no "contact" with the public, but rather limited Plaintiff to no "interaction" with the public. *Id.* In other words, even though the surveillance system monitor job no longer requires contact (i.e., proximity) with the public, because it requires frequent talking (i.e., interaction), the conflict remains unresolved. *Id.* at 9–10.

In response, the Commissioner contends that the ALJ reasonably relied on the VE's testimony to resolve any conflict with the surveillance system monitor job because the VE explained that while the surveillance system monitor job used to require a lot of public contact, the VE's testimony was limited to jobs that required only video surveillance which did not have the same. ECF No. 15 at 7. Additionally, the Commissioner argues that "frequent talking does not necessarily equate to contact with the public or more than occasional, superficial interaction with co-workers," and that a number of courts have concluded that the job does not require interaction with the public. *Id.* at 10 (citing *Harper v. Berryhill*, No. 17-1682, 2019 WL 652358, at *2 (W.D. Pa. Feb. 15, 2019)). The Commissioner further argues that Plaintiff relies on an improper distinction between "interaction" and "contact" and that Plaintiff's definition of contact does not actually appear in the Commissioner's regulations. *Id.* at 11.

Plaintiff's argument is unavailing for several reasons. First, despite Plaintiff's contention, neither the regulations nor the Social Security Administration Program Operations Manual System ("POMS")[5] creates the distinction between "interaction" and "contact" that Plaintiff contends creates the conflict in this case. While the regulations do define interaction, *see* 20 C.F.R. Pt. 404,

---

[5] POMS is a set of policies issued by the Social Security Administration to be used in processing claims. The reviewing court will defer to POMS provisions unless they are arbitrary, capricious, or contrary to law.

12

Subpt. P, App. 1, § 12.00(E)(2), neither the Social Security Administration regulations nor POMS defines the term "contact." As the Commissioner correctly points out, the POMS section that Plaintiff cites does not even use the word contact, thus the Court questions why Plaintiff insists that POMS "defines contact" at all. *See* POMS DI 25020.010(B)(3)(g). Accordingly, there is no authority in the Social Security Administration that defines "contact" in a way that creates a conflict in the VE's testimony.

Second, as the Commissioner also points out, a number of courts have held that the surveillance system monitor job does not require *interaction* with the public, even though it requires frequent talking. *Harper v. Berryhill*, No. 17-1682, 2019 WL 652358, at *2 (W.D. Pa. Feb. 15, 2019) (citing *Dyer v. Comm'r of Soc. Sec.*, No. 14-454, 2015 WL 4112145 (S.D. Ohio July 7, 2015) (accepting VE's testimony that the surveillance systems monitor position required no interaction with the public); *Alcott v. Colvin*, No. 13-01074, 2014 WL 4660364, at *8–9 (W.D. Mo. Sep. 17, 2014) ("[n]othing in the job description for surveillance-system monitor includes interaction with the public.")). Plaintiff cites no authority for the proposition that the surveillance system job, requiring frequent talking, necessarily conflicts with a limitation to no interaction with the public.

*2. The Addresser Position.*

Relying on the same distinction between contact and interaction the undersigned rejected above, Plaintiff argues that the addresser position is not available to him. Plaintiff argues that his RFC limitation to only "occasional contact"—i.e., in Plaintiff's terms, "proximity"—necessarily conflicts with the addresser position because the VE explained that this position would need to be performed in a corporate mailroom. ECF No. 13 at 10–11. According to Plaintiff, it is necessarily a conflict that Plaintiff be limited to only occasional contact (proximity) with coworkers and also

13

work in a corporate mailroom, which, according to Plaintiff, must inherently involve physical proximity to others. *Id.* at 11. In response, the Commissioner contends that for the same reasons as the surveillance system monitor position—that there is no distinction in the Commissioner's regulations between "contact" and "interaction"—there is no conflict between Plaintiff's RFC and the addresser position. ECF No. 15 at 12. The Commissioner further contends that even if Plaintiff was correct that "contact" is defined by proximity, Plaintiff's argument that the addresser position in a corporate mailroom necessarily requires more than occasional proximity to others is purely speculation, as nothing in the DOT entry for addresser position discusses proximity to others. *Id.* at 12, n.4.

Plaintiff's argument that his RFC limitation to only "occasional contact" necessarily conflicts with the addresser position is unpersuasive because it relies on the same faulty definition of "contact" as explained above. Despite Plaintiff's contentions, neither POMS nor any other Social Security Administration regulation defines "contact" in terms of "proximity." Moreover, Plaintiff's contention that the addresser position in a corporate mailroom would necessarily involve more than occasional "contact" or "proximity" to others is purely speculation by Plaintiff. The DOT entry for "addresser" describes the "addresser" job as one who: "[a]ddresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail." DOT, No. 361.687-018, 1991 WL 671797 (addresser). At the hearing, the VE testified that this job would be performed "in a corporate mailroom, not a post office." R. at 53. While Plaintiff argues that "[i]t is odd to imagine the logistics it would take to physically station [an employee with Plaintiff's RFC] . . . inside of a 'corporate mailroom' where he can do his job with no co-workers being in physical proximity to him 5.36 hours out of the 8-hour workday," ECF No. 13 at 11, that argument is purely speculative. There is nothing in the DOT entry for addresser or

14

the VE's testimony that suggests more than occasional contact with others, nor does Plaintiff point to any authority for the proposition that occasional contact conflicts with the addresser position. Plaintiff's speculation that a job in a "corporate mailroom" must inherently involve more than occasional contact with others does not trump the VE's testimony that Plaintiff could perform such a job. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (explaining that vocational experts "have expertise and current knowledge of working conditions and physical demands of various jobs; knowledge of the existence and numbers of those jobs in the national economy; and involvement in or knowledge of placing adult workers with disabilities into jobs.") (cleaned up). Accordingly, the ALJ did not err by failing to identify a conflict between the VE's testimony and the addresser position.

### B. The ALJ Identified Jobs That Exist in Significant Numbers in the National Economy That Plaintiff Can Perform.

Plaintiff contends that because both the surveillance system monitor position and addresser position are unavailable to Plaintiff, the ALJ's identification the table worker job, with only 3,000 positions available nationally, is not a significant number in the national economy and accordingly, cannot be used to deny Plaintiff disability. ECF No. 13 at 5–7. Further, in his reply brief, Plaintiff raises for the first time the argument that the "addresser" position is obsolete in the national economy, and is therefore unavailable to Plaintiff. ECF No. 16 at 4–5. The Commissioner argues that Plaintiff's contention that the table worker position does not exist in significant numbers in the national economy is moot because both the surveillance system monitor and addresser positions are available to Plaintiff in significant numbers. ECF No. 15 at 13–14. The Commissioner did not seek leave to file a sur-reply respond to Plaintiff's new argument made in his reply brief regarding the obsolete nature of the addresser position.

At step five of the sequential analysis, the burden shifts to the Commissioner to demonstrate that the claimant can perform work that exists in the national economy considering the claimant's RFC, age, education, and work experience. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). So long as the ALJ identifies at least one occupation existing in significant numbers in the national economy that the claimant can perform, the ALJ satisfies his or her burden at step five. *See Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 859 (N.D.W. Va. 2009).

Work "exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country." §§ 404.1566(a), 416.966(a). Further, work exists in the national economy "when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant] is able to meet with [the claimant's] physical or mental abilities and vocational qualifications." §§ 404.1566(b), 416.966(b). But, work that involves only "[i]solated jobs" existing "in very limited numbers in relatively few locations outside of the region where [the claimant] live[s] [is] not considered 'work which exists in the national economy.'" §§ 404.1566(c), 416.966(c).

The Social Security Administration has not adopted a bright line rule for a certain number of jobs to qualify as "significant" to meet the ALJ's burden at step five. *Mayo v. Astrue*, No. 3:10cv866, 2012 WL 859344, at *12 (E.D. Va. Feb. 24, 2012), *report and recommendation adopted*, No. 3:10cv866, 2012 WL 859557 (E.D. Va. Mar. 13, 2012). As Plaintiff aptly recognizes, courts around the country have generally held that at least 10,000 positions in the national economy is a "significant" number. ECF No. 13 at 6 (citing *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (finding that 25,000 jobs likely represents a nationally significant number); (*Young v. Astrue*, 519 Fed. App'x 769, 772 (3d Cir. 2013) (holding that 20,000 jobs is sufficient to support a finding that work exists in significant numbers in the national

16

economy); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (finding 10,000 jobs in the national economy significant); *Terri G. v. Comm'r of Soc. Sec.*, No. 3:18-CV-0066, 2019 WL 1318074, at *11 (N.D.N.Y. Mar. 22, 2019) (finding 9,493 jobs not significant in the national economy); *Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 231 (N.D.N.Y. 2015) (finding 13 jobs regionally and 5,160 jobs nationally not significant); *see also Vining v. Astrue*, 720 F. Supp. 2d 126, 137 (D. Me. 2010) ("numbers of jobs in the ballpark of 10,000 to 11,000 nationwide have been held 'significant.'").[6]

In a similar vein, the Fourth Circuit has at least alluded that as few as 110 jobs in a *local* economy is a significant number, and lower district courts have followed suit. *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (stating that "approximately 110 jobs testified to by the vocational expert [does not] constitute an insignificant number."); *Critchley v. Colvin*, No. 5:15-cv-08288, 2016 WL 3030211, at *8 (S.D.W. Va. May 4, 2016) (finding that "100 jobs in the regional economy, even in a single occupation, constitutes a significant number of jobs"), *report and recommendation adopted*, No. 5:15-cv-08288, 2016 WL 3033763 (S.D.W. Va. May 26, 2016). An ALJ can satisfy his or her burden at step five by identifying jobs that exist either nationally or in the local economy, so long as there is nothing to suggest the job would exist only in isolated locations. *McCall v. Saul*, 844 F. App'x 680, 681 (4th Cir. 2021) ("We hold that evidence of jobs

---

[6] At least one district court in the Fourth Circuit has held that 3,000 jobs in the national economy is significant. *Aquino-Hernandez v. Saul*, No. cv 9:19-582, 2020 WL 4678823, at *5 (D.S.C. Mar. 11, 2020), *report and recommendation adopted*, No. 9:19-cv-582, 2020 WL 2487554 (D.S.C. May 14, 2020). However, that case appears to rely on cases which found hundreds of jobs in a *regional* economy significant, not the national economy. *Id.* (citing *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (referring to 110 jobs in the regional economy); *McDonald v. Colvin*, No. EDCV 12-1700, 2013 WL 5492551, at *3 (C.D. Cal. Sept. 30, 2013) (finding 1,000 regional jobs and 20,000 national jobs significant); *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (finding 1,350 jobs in the local economy significant) *Barker v. Sec'y of Health & Hum. Servs.*, 882 F.2d 1474, 1478–79 (9th Cir. 1989) (finding 1,200 jobs in the relevant geographical area significant); *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992) (finding 650-900 jobs in the state significant)).

existing nationally constitutes evidence of work existing in several regions of the country, at least where there is nothing in the number of jobs or the nature of the jobs identified to indicate that those jobs would exist only in limited numbers in isolated regions of the country.").

Although Plaintiff encourages this Court to find that addresser position is obsolete (and therefore should not be considered at all),[7] the Court need not reach that issue here because the ALJ identified two other positions that Plaintiff can perform that exist in sufficient numbers in the national economy—the surveillance system monitor with 161,000 positions nationally, and table worker with 3,000 positions nationally.[8] *See* R. at 25, 53–54. Plaintiff does not dispute that a total of 164,000 positions nationally constitutes a significant number of jobs. ECF No. 13 at 5–6

---

[7] Although Plaintiff argues the addresser position is obsolete, the Court is reluctant to find the position obsolete under these circumstances. First, Plaintiff points to a case from the Eastern District of North Carolina where that court found that the 2011 Social Security Administration Occupational and Medical-Vocational Claims Review Study ("the Vocational Study"), which found it "doubtful" that the addresser job existed in significant numbers in the economy, "reduces the reliability and credibility of the VE's testimony and casts further doubt on the ALJ's conclusion that jobs exist in significant numbers that the plaintiff can perform." *Burney v. Berryhill*, 276 F. Supp. 3d 496, 500 (E.D.N.C. 2017); *see also Skinner v. Berryhill*, No. CV 17-3795-PLA, 2018 WL 1631275, at *6 (C.D. Cal. Apr. 2, 2018) (finding that the Study, along with other case authority on "addresser" positions "additional doubt on the reliability and credibility of the VE's testimony and on the ALJ's conclusion that "addresser" jobs exist in significant numbers."). However, other courts in the Fourth Circuit that have addressed this issue, including recently in Eastern District of North Carolina, have found that the ALJ can rely on the VE's testimony that addresser jobs exist in the national economy, so long as the testimony is not in conflict with the DOT. *See e.g., Dixon v. Saul*, No. 4:20-CV-53-FL, 2021 WL 826776, at *11 (E.D.N.C. Jan. 26, 2021), *report and recommendation adopted*, No. 4:20-CV-53-FL, 2021 WL 815836 (E.D.N.C. Mar. 3, 2021); *Williams v. Berryhill*, No. 5:18-CV-214-FL, 2019 WL 2970850, at *9 (E.D.N.C. Apr. 29, 2019), *report and recommendation adopted sub nom. Williams v. Saul*, No. 5:18-CV-214-FL, 2019 WL 2932741 (E.D.N.C. July 8, 2019); *Bolick v. Berryhill*, No. 5:16-CV-224-GCM, 2018 WL 4107999, at *4 (W.D.N.C. Aug. 29, 2018). In this case, the VE testified that the addresser position was available to Plaintiff with 19,000 jobs nationally, and the ALJ is permitted to rely on that testimony. *See Dixon*, 2021 WL 826776, at *11. Second, this case is distinguishable from cases that Plaintiff cites regarding the obsolete nature of the addresser position because here, the VE specified that such a position would be performed in a corporate mailroom. In several cases finding the addresser position obsolete, courts have focused on the DOT description that the job involves "address[ing] by hand or typewriter." *See e.g., Skinner*, 2018 WL 1631275, at *6 ("it is not unreasonable to assume that the occupation of 'addresser,' . . . is an occupation that has significantly dwindled in number since 1991 in light of technological advances."). Accordingly, here, the VE, who is responsible for current knowledge of working conditions, *see Biestek*, 139 S.Ct at 1152, provided specific testimony that may distinguish the potentially obsolete nature of the addresser position.

[8] For the same reasons, even if there was a conflict between Plaintiff's RFC limitation to only "occasional contact" and the addresser position, *see* Section V.A.2., *supra*, the ALJ's error would have been harmless.

(recognizing that 25,000 national jobs is likely significant); *see also Sylvia M. v. Saul*, No. 3:19cv428, 2020 WL 5047066, at *5 (E.D. Va. Aug. 26, 2020) (recognizing that "[t]his Court has previously held that the surveillance system monitor position exists in significant numbers in the national economy"), *aff'd sub nom. McCall v. Saul*, 844 F. App'x 680 (4th Cir. 2021). Accordingly, even if the ALJ erred by identifying the addresser position, the ALJ satisfied his burden at step five by identifying two additional positions—surveillance system monitor and table worker—together existing in significant numbers in the national economy that Plaintiff can perform. Additionally, because both positions are available to Plaintiff, Plaintiff's argument that the table worker position alone, with 3,000 jobs nationally, does not constitute a significant number of jobs, is moot.

For the reasons stated above, the Court **FINDS** that substantial evidence supports the ALJ's step five determination that Plaintiff can perform other work that ecists in significant numbers in the national economy.

## VI. <u>RECOMMENDATION</u>

Because substantial evidence supports the Commissioner's decision and the correct legal standard was applied, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 14, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. <u>REVIEW PROCEDURE</u>

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date

this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

/s/ Lawrence R. Leonard
Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
January 10, 2022